Case number 16-5064. Harriett A. Ames, Appellant v. United States Department of Homeland Security at Elk. Mr. Carl for the Appellant, Mr. Tate for the Appellees. Good morning, Your Honor. Let's wait until the court clears and everybody sits down. All right, Mr. Carl, good morning. Good morning, Your Honor. This may please the court. The Congress, more than 40 years ago, made a judgment call about a policy choice to use the expression in the legislative history, the expression that this court has adopted on several decisions to curb overzealous investigators, and we submit that's precisely what we have in this instance. We've outlined a number of disputes of material fact. The case was decided below on summary judgment. The best example, perhaps the most glaring example, is the claim that somehow Ms. Ames admitted wrongdoing, that we'd submit it's not what her statement says at all. There's the claim in the background that there was a real threat to national security. Well, if there was a threat to national security, the investigator, he was advised to do something back in August of 2011. That concludes the reclaim of national security. He does not, we submit, justify his violation of the Privacy Act and similarly the law enforcement exception. You could have lost me there. The government's claim is that falsification or interference in the process of securing a clearance is a national security matter. Now, how does that have to do with your statement that you should have done something back in August? Well, there's a claim that Ms. Ames improperly cleared somebody for a security clearance, but the reality is that there was a dispute over whether or not the security clearance ought to be issued and what's missing in this case, Your Honor. And, you know, I looked at your decision in the Center for National Securities and Judge Henderson's decision in Ryan, and the theme is deference to the experts, and certainly in the National Center for National Security case, there were affidavits from top level or top counterterrorism officials. There's no such affidavit here, Your Honor. It's the opinion of the- We're talking about the whole subject matter of the investigation issuance of the security clearance. I'm not sure why you think there would have to be a specific affidavit. Well, the agent completed the investigation, gave it to his superiors, and- He did the investigation of Ms. Ames, though. Yes, Your Honor. It never was completed and given to superiors in the ordinary court because she handed it up, correct? Well, he gave it to his superiors. His superiors signed off on it in May of 2012, and the reaction in his office was that it was not appropriate to take any sort of further action. It went blue and blue. I didn't make the rounds up there and there, and got sort of, if not approval, at least a nod for what he was doing in terms of giving the information to the other agents, right? That's correct, Your Honor. He called, there was a telephone call on July 13th of 12, and follow-up emails in which he listed specific accusations. Why isn't that something that an investigator should have done in the area of security clearance? Well- If he had a reason to think there may be a problem with security clearance, and the subject of the investigation has changed jobs, and is in another sensitive position, what was it his duty, right at least, not duty, to give that information to the other agents? We'd submit that that goes directly counter to the policy behind the Privacy Act of curbing overzealous investigators. He is a mid-level investigator. You're calling it a name, as I said in the last case, that's not actually a problem. Overzealous is your conclusion, and I'm asking you why it's overzealous for somebody doing a background investigation- He reported- To pass the information over to another agency, or he becomes irrelevant. Well, he disclosed he reported it to his superior, and it was up to his superior in the Inspector General's office to decide whether it was appropriate or proper to share the information, and it's a decision that's appropriately far above Inspector Yee's grade level, and the whole idea behind the Privacy Act is that there would be a process for allowing information to be transmitted from one agency to another. And secondly, Yee did not have the expertise. The area of security clearances is broken down to where one person does the investigation and somebody else makes a decision in adjudication as to whether or not there is a genuine, a bona fide threat to- There was still an adjudication to be made at the NGA, the new agency, and he supplied the information he had to the- at Yee or the investigative office. But there's still an adjudication to be made by somebody else. But there's an internal process at FEMA for making these decisions, for determining whether or not somebody's in fact entitled to retain a security clearance, and even though Ms. Ames was ultimately terminated by NGA, her clearance was never pulled. There was no formal adjudication that she was not entitled to a security clearance, and there's a process in place for doing this. And to go back to the question of was there a real belief that there was a national security issue here, Yee had all this information on August 1st of 2011, and he took no action whatsoever to have Ms. Yee investigated or have her clearance pulled if he really, really believed that there was a bona fide national security issue present here. And we'd submit that, A, he didn't really believe that. He was looking for some way to get around the Privacy Act, and he did that by making these improper disclosures both on the telephone and following up with emails. And the emails are very specific about the accusations that he's levying against Ms. Ames, that she willfully did this and she willfully did that. And if you look at the record, and this goes back to the fact that the case was decided on summary judgment, the record doesn't support that. The record doesn't support that, for example, the district court's finding that she admitted wrongdoing or that she violated the government's policy on the security clearance. There are disputes of fact which should have required a trial in this particular instance. And if Yee really thought there was, I mean, Yee's position we'd submit is internally inconsistent because if he really thought there was a national security issue, he was obliged to take action in August of 2011. What he wanted to think, whether you agree that he did think it or not, was that there was something that might affect her security clearance, right? Yes, Your Honor. And what the action he took was to report it to the agency in which she would be exercising her security clearance. But he had a chance to do all this while, in fact, Ms. Ames was working at DHS in FEMA. And if Yee really thought there was a problem with her issue in a security clearance, he was obliged. If Yee really thought there was a genuine national security issue then, he was obliged to take action in August. And the circumstances here were Yee sneaking around behind the supervisor's back. He's making these disclosures in order to induce or persuade DOD to make a formal request. This suggests two things. Number one is that he knew he shouldn't be doing it. And number two, he knew that a written request was actually required. And we argue that what Yee did was certainly far beyond the scope of his responsibilities, far beyond his responsibilities at that grade level. And in passing the Privacy Act, we don't believe that Congress intended to let a mid-level investigator ignore the process and go behind the back door to make these kinds of disclosures. You and Yee are both pretty broadly working at Capital H and Capital G Exceptions. Capital H and Capital G Exceptions and the Privacy Act are both pretty broadly working. Shouldn't this have been one of the other of them? Well, Your Honor, in the circumstances here, what we have is factual disputes as to exactly what Ms. Ames did. Ms. Ames had the expertise in making the adjudications, and he disagreed with her, and then he conflates this into an issue of law enforcement and national security. And the fact that Yee's supervisor didn't recommend taking any action, and the inference can be drawn from that, that, in fact, Yee was making the whole thing up for whatever personal reasons motivated him. What we have here in the district court decision are findings of, for example, common sense or that he acted with due diligence. And we think there's certainly an alternative view of the evidence that Yee was on a mission of his own, that he was engaged in some sort of vendetta, and that, in fact, he was looking for a way to essentially get around the scope of the Privacy Act. And his decision to do that is not entitled to any deference by this court. All right. We'll give you a couple minutes and respond. Thank you, Your Honor. All right. Mr. Topp? Good morning, Your Honor. Damon Tate for the defendant with the U.S. Attorney's Office. I think Judge Sentelle's point at the end really cuts to the heart of what the issue is here, which is that we have two routine uses that are indeed broadly worded, as Your Honor suggested. And we had no argument at any point that they are impermissibly broadly worded. They were subject to notice and comment, and they were duly promulgated. We've had no argument that the plaintiff was not put on notice thereby. So what we really have is two questions. Is the disclosure compatible with the purpose for which the records were collected? And the district court said there was no real argument on that point below from the plaintiff, but I'm happy to talk about it. And second of all, assuming there is that compatibility, does the disclosure here fall within either one or the other or both of the routine uses? And we think it actually falls comfortably within both. We've heard mostly throughout this case, and indeed in oral argument, a notion that the prosecutor here was overzealous. And we would characterize it as appropriately zealous, and I can talk more about that. But the broader point is that that just doesn't matter, given how the district court decided that case, because zealousness, appropriately or otherwise, goes, if anything, to the willfulness or intentionality aspect of that. We think that's an alternate grounds for affirmance, and we'd urge it if the court has to get there. But the district court didn't need to, because that has nothing to do with the language of the routine uses. And that's where we think that this case ultimately should be decided, where the district court did decide it. On the compatibility test, the district court embraced the Third Circuit and the Ninth Circuit test, or at least it applied it, although this circuit notably has not done so. The only discussion that this circuit has had about the compatibility test and those decisions is the U.S. Postal Service's case in 1993. That's 9F3rd at 138. And among three judges, there were three opinions there, actually. Judge Silberman expressed sympathy with that standard, which requires something bordering on identity, the purpose of collection and the purpose of disclosure. It's a very aggressive standard. Judge Williams concurred in the judgment, but not in that part of the opinion, because he said the word compatibility is not the same as the word congruent or identical. And in his view, compatibility means lack of incompatibility. And we would express sympathy with that. Judge Randolph, in dissent, didn't reach it. Ultimately, the court expressly didn't reach the question. But the broader point of view is that it's not the same. What do you want us to do in terms of phrasing the compatibility test? And if we write an opinion, how would you suggest it be articulated? We would suggest language very similar to Judge Williams's reasoning, which he asked, is there a conflict between the purpose of collection and the purpose of disclosure? And if there's no conflict, then it is compatible with. You could also describe it as consistent with. And I think either one of those is more faithful to the notion of compatibility in that word choice than what the Third and the Ninth Circuit did. I don't know that, frankly, it matters to the outcome of this case. Judge Chevelle held it didn't because she noted the lack of instruction from this circuit and said that even applying the more aggressive standard, this is a fairly straightforward case. Let me agree with that. So I just wanted to note that ambiguity. And having noted it, here there is a concrete relationship or similarity or a meaningful degree of convergence, which is how the Third Circuit expressed it. And that's because the purpose of the collection was to protect national security by ensuring that an officer charged with granting the very top security clearances was doing so faithfully to the regulations that govern it and was truthfully participating in investigations that go directly to national security. And the purpose of disclosure was to ensure exactly the same thing for exactly the same employer elsewhere in the national security community. So short of... What do you say to DePellett's argument that he should have gone further up the chain before making any... I think that two responses. First of all, if anything, that again goes to the willfulness or intentionality argument. But putting that argument aside, I think they're just wrong about how they describe how high he did go. I can give three examples. First of all, in the ROI itself, it's true he drafted it. But in his deposition, and there's no contrary evidence, he had a collaborative process with his supervisor. After he drafted it, it went back and forth several times where each of them was making changes. Izzard, the supervising special agent, signed off on it. And there was also testimony that John Ryan, who was Agent E's second-level supervisor, also was involved with that. So this is not an agent off on a frolic and detour. There are procedural steps in there, and it might not have gone all the way to the inspector general. But the OIG's Office of Investigation's Special Agent Handbook, Chapter 12, states that the special agent in charge is the one who's supposed to review and sign these things. So the process was followed. Then the next step was the office decided to refer this case to the AUSA and D.C. for possible criminal prosecution. And again, there was uncontradicted testimony that Agent E consulted with Izzard and with Ryan, and they jointly decided to make that referral. The prosecutor declined prosecution, but again, he was working collaboratively. And then before there was any disclosure at all, he reached out to Izzard, his supervisor, and Blue, and Lou, who were in the Personnel Security Division, to see whether they thought that that was an appropriate step. And he was told explicitly that it was because his own agency couldn't do anything about it. And that makes sense because in his deposition he explained that his job as an investigator is to gather relevant facts and then present them to somebody who can make a security determination. And maybe the clearance would be revoked. Maybe it wouldn't. That's not in his purview. But his job is to make that referral to a decision-making authority. And here, because the plaintiff had moved on, the appropriate person to make that authority was at a different agency. So he reached out and then followed the appropriate steps to formally release the ROI, and that had more formal trappings because once you release the ROI, that has evidentiary worth that a phone call may not. It's more consequential and it's more sensitive. So in the government's view here, this fell squarely within the law enforcement routine use. Plaintiff spends a lot of ink talking about, well, it's a question of fact. Well, no, it's not. There were numerous findings in the ROI that was formally adopted by the agency. But even assuming they're right about everything they say, the routine use doesn't require it. Routine use G says that where there's a violation or potential violation of law, and certainly there's enough here to say there was at least a potential violation of a law or a regulation, and that's enough to fall within the routine use here, the language of which the plaintiff has challenged. On the national security routine use, again, we believe that the district court rightly said that this is a comfortable application of it because the executive order in question encourages and expects reporting of potential national security issues. The language is any information that raises doubts as to whether another employee's continued eligibility for access is consistent with the national security interest. This court's decision in Rattigan, granted it was in a Title VII context, but in interpreting that executive order said that it encourages broad reporting precisely because the entities charged with making security clearance decisions need full access to even unsubstantiated and doubtful information in order to make sensitive, predictive judgments. So here, in light of the agency's formal findings that were not just that she admitted it, we say she did, but even if she didn't, that was only one of the several things it found. It found that she falsely denied knowing that Walker, who was an applicant, had a previous criminal conviction. The plaintiff has not disputed that, to my knowledge. And then it found that she may have provided false information to an OPM investigator. So these findings are not contradicted. They are borne out by record evidence, and at the very least, they are potential violations of law or regulations. And given that, it is comfortably within the national security routine use that, potentially, somebody who is granting the uppermost security clearances at an intelligence agency may be doing so in a way that is not consistent with those very sensitive requirements. If there are no other questions, we would seek affirmation. Thank you. All right. Why don't you take two minutes, Mr. Powell? With respect to the routine uses issue, the statute clearly says that you can't release law enforcement documents unless there's a written request. And what Lee was trying to do was to get DOD to issue that written request. And this Court has repeatedly held that you cannot use routine uses exceptions to circumvent the mandates of the Privacy Act. And Dill v. Genova and Dill v. Stevens, 851 fed 2nd at 239 and 779 fed 2nd at 85, that this case law from this Court is clear. Counsel mentioned the referral to the Assistant United States Attorney. Well, it was an oral referral. And it's hard to acknowledge or believe that if you really thought there was a serious law enforcement issue, that there wouldn't be any transmittal to the Department of Justice. It would actually be in writing. The Inspector General Act talks about reporting to the Attorney General of the United States potential criminal findings. It doesn't say anything about reporting the findings of one Inspector General's office to another Inspector General's office. There's detailed information in the factual record that, in fact, Ms. Ames contradicted. Disagreed with the findings. As I mentioned, the most glaring example is the District Court said she admitted wrongdoing. She did no such thing in those pages that were in her declaration. And the issue here is whether or not the Privacy Act allows somebody like Ye to do this when his agency has decided to do nothing and where Ye never consulted with counsel or got permission from his supervisor. And none of the documents say that Ye's reaching out to another agency is okay or that it's been approved by anybody in the chain of command. And, in fact, one of the emails that the government relies upon for supposedly blessing or perhaps ratifying Ye's actions was issued in the afternoon of January 13, 2012. But the disclosures that we're focusing on, Your Honor, is the disclosures made in the morning when Ye calls the person over at DOD and says, These are the terrible things that Harriet Ames has done. And then he follows up with a series of emails specifically stating that Ms. Ames willfully did this. Ms. Ames willfully did that. And that, I would submit, is the focus of the Privacy Act claim, that, in fact, he went around the Privacy Act in order to induce DOD to send a written request, which Ye knew was necessary in order to formally release the report. But, in fact, the record shows that damage was done and that DOD opened an investigation immediately upon receiving Ye's email and oral disclosures. The investigation was opened on July 16, approximately six weeks before the report ever actually got to DOD. And so we'd submit that the focus of the court's analysis or the district court's analysis on the release of the report is fundamentally misplaced because the key is the oral and the email disclosures that Ye laid out pretty clearly, the sort of serious accusations he was making against the state. All right. We have your argument. You're over your time. Thank you. Thank you, Your Honor. Call the next plea.
judges: Henderson, Kavanaugh, Sentelle